# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 1:22-CR-139-RCL |
| **CALE DOUGLAS CLAYTON** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Cale Douglas Clayton to 33 months' incarceration, three years' supervised release, $2,000 restitution, and a $200 special assessment. The government's recommended sentence is the midpoint of the applicable 30-to-37-month guidelines range calculated by the United States Probation Office and the parties.

### I.   INTRODUCTION

The defendant, Cale Clayton, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Clayton verbally harassed police officers on the Upper West Terrace, yelling taunts such as "You guys are losing a lot of bodies.  We're coming in, one way or another, we're coming in." As police officers were clearing the north side of the Upper West Terrace, Clayton confronted police three times.  First, Clayton resisted police by grabbing one officer's shield and stealing another officer's baton.  Second, as Clayton retreated from the police line, he encountered Arlington County Police Department ("ACPD") Officer J.M., who was isolated in the crowd. Clayton grabbed and pulled Officer J.M.'s police shield before slinking back into the crowd. Third, Clayton walked the police line flaunting the stolen police baton, and when police attempted to retrieve it, Clayton resisted by shoving Montgomery County Police Department ("MCPD") Officer M.P. in the head and grabbing his face mask.  When interviewed by the FBI, Clayton lied about his role on January 6, claiming he did not riot or engage in violence, and claiming he found the police baton and attempted to return it.

The government recommends that the Court sentence Clayton to 33 months' incarceration for his convictions for violating 18 U.S.C. § 111(a).  This sentence properly accounts for Clayton's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 27, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.      **Clayton's Role in the January 6, 2021 Attack on the Capitol**

Cale Clayton, a 42-year-old carpenter, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos from the body-worn cameras of members of the Metropolitan and Montgomery County Police Departments, open-source video, and surveillance footage from outside of the Capitol.

*Approach to the Capitol*

On January 5, Clayton traveled to Washington, D.C. from his home in Missouri. On January 6, he made his way to the "Stop the Steal" rally and thereafter to the U.S. Capitol.

*Verbally Harassing Police Officers at the Inaugural Grandstands*

By 2:53 p.m., Clayton had made his way above the inaugural stage on the west side of the Capitol, in front of the grandstands. Image 1 (below) is a screenshot taken from the body-worn camera of MPD Officer B.H., showing Clayton taunting and pointing at police officers.



*Image 1; Screenshot from Exhibit 1 at 1:28; Clayton circled in green.*

At 2:55 p.m., as police officers cleared the grandstands of rioters, Clayton yelled at them, "We are going to win. You don't have enough for all of us. You might hit me once or twice. You might spray me with pepper spray. I don't give a fuck. There ain't enough for millions of people here and you know it."   Exh. 1 at 1:55–2:15.

By 3:13 p.m., Clayton made his way *under* the grandstands where he verbally harassed police officers on the Upper West Terrace.   Image 2 (below) is a screenshot taken from the body-worn camera of MPD Officer N.D., showing Clayton taunting and pointing at police officers.



*Image 2; Screenshot from Exhibit 2 at 6:35; Clayton circled in green.*

Between 3:19 p.m. and 3:26 p.m., Clayton yelled the following at police officers:

- "You guys are losing a lot of bodies.   We're coming in, one way or another, we're coming in."

- "Get that pepper spray out, you don't have enough. You fired the first shot. Keep that door open we're coming through right there."

4

- "Tip of the iceberg, what side of history are you on? The revolution is already happening. You are just a little speed bump in our way. It's happening."

*See* Exh. 2.   Clayton left the area underneath the grandstands at 3:34 p.m.

### *Assaults on the Upper West Terrace*

By 3:52 p.m., Clayton moved to the Upper West Terrace, where police officers were attempting to regain control of the area.  At approximately 4:15 p.m., police officers began to clear rioters from the north side of the Upper West Terrace.

At 4:23 p.m., Clayton resisted police attempts to clear the north side of the Upper West Terrace.  Clayton grabbed and pulled the police shield of an unidentified Montgomery County police officer, as captured by the body-worn camera of MCPD Officer J.B. (Image 3, below).



Image 3; Screenshot from Exhibit 4 at :49; Clayton's hand circled in green.

Clayton did not succeed in wrenching the shield from the officer's grasp.

5

A few moments later, Clayton grabbed the officer's police shield again and pushed on it; however, Clayton failed to move the officer backward, as shown in Image 4, below.



*Image 4; Screenshot from Exhibit 4 at :58; Clayton's hand circled in green.*

As MCPD Officer J.B. struggled to clear the area of rioters, his police baton fell to the ground. When Officer J.B. attempted to pick it up, Clayton beat him to it.



*Image 5; Screenshot from Exhibit 4 at 1:11; Clayton's hand circled in green.*

MCPD Officer M.W.'s body-worn camera captured the theft, shown below in Image 6.



*Image 6; Screenshot from Exhibit 5 at :01; Clayton's head circled in green.*

As Clayton retreated into the crowd, he squared up against ACPD Officer J.M. At the time, Officer J.M. was isolated away from the police line and rioters were shoving him. Clayton grabbed and pulled Officer J.M.'s police shield, as shown in Image 7 (below), a screenshot taken from open-source video.



*Image 7; Screenshot from Exhibit 7 at :08; Clayton's hand circled in green.*

7

An ACPD police camera captured the encounter from overhead, but rioters obstructed the view of Clayton grabbing Officer J.M.'s shield. *See* Exh. 6 at 1:24. Clayton's confrontation with J.M. is the basis of Count Three, charging Clayton with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

At 4:25 p.m., Clayton left the Upper West Terrace and descended the northwest stairs. *See* Exh. 8 at :53; *see also* Exh. 8.a (annotated). Clayton could have left the Capitol grounds. He chose not to. Instead, he returned up the northwest stairs at 4:28 p.m., proudly carrying Officer J.B.'s police baton. *See* Exh. 8 at 3:27; *see also* Exh. 8.b (annotated).

Clayton then walked in front of the police line that was attempting to clear the area. As he walked, he flaunted the stolen police baton, as shown in Image 8 below.



*Image 8; Screenshot from Exhibit 9 at :06; Clayton's head and police baton circled in green.*

MCPD Lt. M.P. saw Clayton brandishing the police baton. Lt. M.P. first asked Clayton for the police baton. *See* Exh. 9 at 2:06. Clayton refused. Lt. M.P. grabbed the police baton.

In the ensuing struggle, Clayton shoved Lt. M.P. in the head and grabbed his face mask.



*Image 9; Screenshot from Exhibit 9 at 2:15; Clayton's head and hand circled in green.*



*Image 10; Screenshot from Exhibit 9 at 2:16; Clayton's head and hand circled in green.*

9

Clayton's confrontation with Lt. M.P. is the basis of Count Four, charging Clayton with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

Clayton refused to relinquish the police baton, and as a result, Lt. M.P. pulled Clayton through the police line. Police officers arrested Clayton and held him in the Capitol Rotunda. *See* Exh. 12. Later that day, he was released without charges.

*Defendant's Interview*

On March 15, 2021, the FBI interviewed Clayton, who admitted he was present at the Capitol on January 6. At the time, the FBI did not have evidence of the assaults or the stolen police baton. Clayton lied to the FBI, stating he did not riot or engage in violence.

Clayton also mischaracterized his theft of Officer J.B.'s police baton. Clayton told the FBI that, as he was leaving the Capitol, he saw an officer lose their police baton. Clayton said that he picked it up and approached the police line to return it because Clayton did not want the baton to be used against police. Clayton said the police arrested him because he did not have his hands up as he approached the police line.

This falsehood is belied by video, which shows that at 4:23 p.m., Clayton stole Officer J.B.'s police baton as Officer J.B. was reaching for it. *See* Image 5. At 4:25 p.m., Clayton left the Upper West Terrace with Officer J.B.'s police baton without making any effort to return it. At 4:28 p.m., Clayton came back to the Upper West Terrace and flaunted the stolen police baton. *See* Image 8. When Lt. M.P. attempted to take the police baton from Clayton at 4:30 p.m., Clayton refused, which led to Lt. M.P. pulling him through the police line. *See* Image 10.

### III.     THE CHARGES AND PLEA AGREEMENT

On April 22, 2022, a federal grand jury returned an indictment charging Clayton with obstructing, impeding, or interfering with a law enforcement officer, in violation of 18 U.S.C. § 231(a)(3) (Count One); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Counts Two to Four); theft of property within special and maritime jurisdiction, in violation of 18 U.S.C. § 661 (Count Five); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Six); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Seven); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Eight); and act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine).   On March 10, 2023, Clayton was convicted on Counts Three and Four, based on a guilty plea entered pursuant to a plea agreement.

### IV.     STATUTORY PENALTIES

Clayton now faces sentencing on two violations of 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for each violation.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The government agrees with the PSR's calculation of the applicable offense level, which

is also consistent with what the parties agreed to in the plea agreement. That Guidelines analysis follows:

| | | |
|---|---|---|
| Count Three: 18 U.S.C. § 111(a)(1) | | |
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 20 |
| Count Four: 18 U.S.C. § 111(a)(1) | | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 20 |
| **Combined Offense Level** | | **22** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **19** |

*See* Plea Agreement, ECF 26 ¶ 5(A).

The U.S. Probation Office calculated Clayton's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, with a total adjusted offense level, after acceptance of responsibility, at 19, Clayton's Guidelines imprisonment range is 30 to 37 months. Clayton's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[2] Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level for a Section 111 offense is 10; however, the cross-reference in U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault, as here.

A. **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Clayton's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Clayton had three physical confrontations with police officers and stole a police baton as police officers were clearing the north side of the Upper West Terrace. The nature and circumstances of Clayton's offenses were very serious, and fully support the government's recommended sentence of 33 months' imprisonment.

B. **The History and Characteristics of the Defendant**

Clayton's history is unremarkable. He grew up in Drexel, Missouri, where he lived with his parents and siblings, and never experienced any abuse. PSR ¶¶ 61–68. Clayton has one prior conviction, for possession of drug paraphernalia in 2001. *Id.* ¶¶ 54–56. Nothing about Clayton's history mitigates his overwhelmingly willful conduct on January 6, 2021.

C. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Clayton's criminal conduct on January 6—taunting and assaulting police officers, trying to steal their riot shields and stealing their baton—was the epitome of disrespect for the law.

D. **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

13

domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Clayton repeatedly confronted, resisted, and assaulted police on the Upper West Terrace over the course of 90 minutes, at various times taunting them, attempting to steal their police shields, and stealing a police baton. At no point in that time period did he reconsider his conduct; rather, his conduct grew bolder, beginning with taunts and concluding with shoving Lt. M.P. in the head and refusing to relinquish the stolen police baton. Further, Clayton's intentional falsehoods to the FBI more than two months later demonstrate his lack of remorse.   The sentence imposed must be sufficient to provide specific deterrence from committing future crimes of violence.

E.   **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

14

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

15

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Dennis*, 21-cr-679 (JEB), the defendant was found guilty after a bench trial of two counts of 18 U.S.C. § 111(a) and other lesser offenses. Like Clayton, Dennis was in the area near the inaugural stage on the west side of the Capitol, and verbally harassed the police line forming on the Upper West Terrace to clear rioters. Dennis approached the police line and grabbed one officer's police baton, was pushed backward, and then came back at the police line to strike a second officer. Like Clayton, Dennis committed two assaults in resisting the police line on the Upper West Terrace, and neither defendant entered the Capitol building. Judge Boasberg sentenced Dennis to 36 months' incarceration. While Dennis faced a higher guideline range than Clayton (because Dennis went to trial), Clayton, unlike Dennis, confronted the police line three times, successfully stole a police baton, and had numerous opportunities to leave in between confrontations.

In *United States v. Fairlamb*, 21-cr-120 (RCL), the defendant pled guilty to one count of 18 U.S.C. § 111(a)(1) and one count of 18 U.S.C. § 1512(c)(2). Like Clayton, Fairlamb stole a police baton, verbally harassed police lines, and struck an officer in the head. Unlike Clayton, Fairlamb also went inside the Capitol and pled guilty to § 1512(c)(2). This Court sentenced Fairlamb to 41 months' incarceration.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers J.M. and M.P., did not suffer bodily injury as a result of Clayton's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Clayton must pay $2,000 in restitution, which reflects in part the role Clayton played in the riot on January 6.[7] Plea Agmt. ¶ 10(G). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

18

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Clayton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See id.*

### VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 33 months' incarceration, three years' supervised release, $2,000 restitution, and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: */s/ Michael L. Jones*
MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
601 D St. NW
Washington, DC 20530
(202) 252-7820
michael.jones@usdoj.gov